J-S22019-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SETH MULL | : | |
| | : | |
| Appellant | : | No. 2245 EDA 2021 |

Appeal from the Judgment of Sentence Entered May 13, 2021
In the Court of Common Pleas of Northampton County Criminal Division
at No(s): CP-48-CR-0001794-2019

BEFORE: BOWES, J., McCAFFERY, J., and SULLIVAN, J.

MEMORANDUM BY McCAFFERY, J.: **FILED JUNE 27, 2023**

Seth Mull (Appellant) appeals from the judgment of sentence entered in the Northampton County Court of Common Pleas, following his conviction of solicitation to commit promoting prostitution.[1] Appellant raises sufficiency, weight, and admissibility of "prior bad acts" evidence challenges. Based on the following, we affirm.

The underlying facts[2] and procedural history are as follows. While an inmate at the Northampton County Correctional Facility for unrelated convictions, Appellant engaged in communication *via* phone, digital

_____

[1] 18 Pa.C.S. §§ 902(a)/5902(b)(3).

[2] The summary of the facts is based on the testimony and evidence presented at Appellant's two-day bench trial.

messaging,[3] and in letter form with the then 27-year-old female victim, C.F. (the Victim),[4] for the purpose of soliciting her to perform sexual acts for money. The Victim indicated that Appellant first contacted her in July of 2018 because her father was housed in the same prison as Appellant and her father asked Appellant to contact the Victim because he was being transferred to a different facility. N.T., 5/3/21, at 62-63; N.T., 5/4/21, at 8. Appellant and the Victim continued to communicate with one another until January of 2019, when Appellant lost phone and tablet privileges. N.T., 5/3/21, at 40, 67-68.

During this time, the communications between Appellant and the Victim progressed from friendly conversations to discussions sexual in nature. N.T., 5/3/21, at 68. Appellant also directed that the Victim address him as "sir" and provided her with a set of ten rules. *Id.* at 69. He informed her that if she did not follow these rules, "there would be consequences." *Id.* He

---

[3] Inmates were provided with a computer "tablet." N.T., 5/3/21, at 36. To communicate with inmates, family and friends needed to create an account on "gettingout.com." *Id.* They would then access the website to talk with inmates *via* phone or electronically. *Id.* Inmates are assigned "a self-identifier" and when they use the tablet, they enter a personalized pin number. *Id.* The tablet also requires facial recognition where inmate takes a picture at the beginning of a session "and then unbeknownst to them[, the tablet] takes a picture several minutes [later] to make sure the person who is still on [is] the same person." *Id.* The communications are stored on a computer server and the prison officials are able to run reports from the use of those devices for monitoring purposes. *Id.* at 37.

[4] At the time, the Victim had given birth to a child she shared with her husband, was suffering from postpartum depression, and was having financial issues. *See* N.T., 5/3/21, at 66.

requested that the Victim perform certain tasks, which ranged from talking to his grandmother to not wearing underwear to work. *Id.* at 70-71. He asked the Victim to engage in "cosplay," which she described as dressing up "in sexy costumes" and playing video games on camera for "donations." *Id.* at 71-72.

Appellant also "demanded" that she sign up for a website called "rabbitscam.com," which she believed was for the "purpose" of making money by "doing sexual things." N.T., 5/3/21, at 73. The Victim did not want to create an account and said that she would "try to talk [to him] about something else and he would go back [and say], did you sign up for that, it's very important . . . for you to sign up for that, do you understand me?" *Id.* He also "talked about going to sex parties and doing sexual stuff at his condo," which she understood to be "fantasy" because he was incarcerated. *Id.* at 74. At one point, that conversation turned when he "demanded" that the Victim have sex with 20 to 30 men in one night. *Id.* She "knew he was serious because he kept demanding it." *Id.* She also noticed Appellant's "demeanor got really nasty" when she did not immediately agree to the command.[5] *Id.* at 75.

_____

[5] Nevertheless, the Victim kept communicating with him because she "was very scared that he would do something or have somebody come after" her. N.T., 5/3/21, at 75.

The Victim told Appellant about her financial problems and his solution was to have her "fuck for him to make money." N.T., 5/3/21, at 77. On January 2, 2019, Appellant texted her:

[W]e need to get this going [as soon as possible] especially . . . if you are having financial issues and if I can't get to any of [my money] right now. I need you to be strong for me and get this going. We're going to make a ton of money. Trust me.

*Id.* at 130.

On January 3, 2019, Appellant's phone and tablet privileges were taken away and he began to use a fellow inmate's account to continue communicating with the Victim, making 11 phone calls from that date until January 15th. *See* N.T., 5/3/21, at 77-78, 113. The Victim indicated that Appellant told her to go to the District Attorney's Office to find out why the phone was "disconnected[,]" but then started "yelling" at her for talking to a detective. *Id.* at 79.

Appellant was subsequently charged with solicitation to commit promoting prostitution. He filed an omnibus pre-trial motion on September 12, 2019. The Commonwealth filed a motion for evidence of prior bad acts pursuant to Pennsylvania Rule of Evidence 404(b),[6] seeking admission of testimony from four women that had been victimized by Appellant during the

---

[6] Pa.R.E. 404(b) prohibits admission of a defendant's prior bad acts to prove the defendant's character, unless such evidence is admitted for other purposes. *See* Pa.R.E. 404(b)(1)-(2).

period of September 1, 2017 and October 29, 2017, and his convictions of numerous crimes committed against them. *See* Commonwealth's Motion for Admission of Evidence of Prior Bad Acts Pursuant to Pa.R.E. 404(B) (Commonwealth's Rule 404(b) Motion), 11/7/19, at 2 (unpaginated). The Commonwealth argued that "the prior convictions for involuntary servitude – sexual servitude and human trafficking committed by [Appellant] can be shown to establish a common scheme, plan, intent, absence of mistake and motive for the current solicitation of [the Victim] to engage in prostitution for his financial benefit." *Id.* at 4. Moreover, the Commonwealth alleged the "prior sexual assault convictions demonstrate[d] similarity to the instant case[ ] as the initial interaction with each victim was legitimate until [Appellant] created an opportunity to attack, all white females, groomed them into trusting him, exploited that trust, directed the women to enter into a sex slave contract with him, had the women set up accounts on websites to solicit men and then had the women raped by other men for his financial benefit." *Id.*

Appellant filed a response in opposition to the Commonwealth's Rule 404(b) Motion on May 26, 2020, arguing that the evidence did not demonstrate "a common plan or scheme, or motive, or absence of mistake, or intent in regard to the crime charged in the instant case" and "would unfairly prejudice the jury against" him. Appellant's Response in Opposition to the Commonwealth's Rule 404(b) Motion, 5/26/20, at 1. On April 5, 2021,

the trial court granted the Commonwealth's Rule 404(b) Motion as to two of the four victims — A.F. and J.M. *See* Order, 4/15/21.

The matter proceeded to a two-day bench trial on May 3, 2021. At trial, the Victim testified about her relationship and communications with Appellant. A copy of their tablet messages, which was 46 pages in length, was admitted into evidence. *See* N.T., 5/3/21, at 79-80. The Victim was asked about certain messages she exchanged with Appellant. *See id.* at 80-89. For example, when the Victim messaged him about her financial issues, he texted her that "cosplay was an easy way" to make money and that "[w]ebcamming pays a ton." *Id.* at 80. He also sent her the rules for participating in a dominant-submissive relationship,[7] and stated:

> Well, what turns me on is when I see my sub doing whatever it is I tell her to do. You need to transcend from just the physicality. I am going to teach you how to be greater than just that. Be more than just touch. I want you to set up an account on rabbitscam.com. That needs to be done today. No debate on that one. The amount to start is doing to be anywhere from 20 to 30 [men]. It will be an all night thing. We can go to a sex club for the first time or maybe just the condo we have. The guys will listen to me or they'll get fucked up. Bottom line is very simple, if they deviate from anything, it will be the same result.

*Id.* at 87. Approximately one hour after he sent that message, he texted her: "The Rabbits Cam startup is free. You ask[ed] how many guys and I told you. I can see myself falling [for you], yes. I also see you not doing what I told

---

[7] *See* N.T., 5/3/21, at 84.

you to do. That is unacceptable. Do you understand me?" *Id.* at 87-88. The final message sent by Appellant to the Victim was: "That's why I am trying to tell you, it's going to be rough here now especially when I have you start doing your tasks, when I start having you fuck for me." *Id.* at 88.

On cross-examination, the Victim testified that "sexual[ly] explicit communications" were done "[s]olely on the tablet." N.T., 5/3/21, at 89. Defense counsel questioned the Victim about when she became scared of Appellant and she stated that it was after he demanded that she have sex with 20 to 30 men because his "demeanor" changed where he "was all nice and friendly, and then all of a sudden it was . . . you're going to do this for me." *Id.* at 97. The Victim indicated that she felt "[v]ery compelled" to agree with him because "[i]f [her] demeanor changed to him, he would have caught . . . on" and she did not know what would have happened after that. *Id.* at 99. The Victim stated that they "never had a plan financially" as to who was going to get paid and how much they would be paid because "[t]hat was all up to him. [She] had nothing to do with it." *Id.* at 100.

The Commonwealth also introduced the testimony of A.F. and J.M. as Rule 404(b) witnesses. A.F.[8] testified that that she met Appellant on October 19, 2017, at a hotel in Bethlehem, Pennsylvania. *See* N.T., 5/3/21, at 137, 142. She was originally supposed to meet at a friend at the hotel who told

---

[8] A.F. was 19 years old at the time. *See* N.T., 5/3/21, at 137.

her that she could make some money, but when she got there, "things seemed kind of suspicious" because "people were forcing" her to take drugs. *Id.* at 140-41. A.F. stated Appellant specifically forced her: (1) to sniff and smoke drugs; (2) get undressed and remain naked; and (3) have sex with men for money while she was "blindfolded and tied up."[9] *Id.* at 141-42. She could hear him asking for $100.00 from each person that came into the room. *Id.* at 143. A.F. never received any money from the sex acts. *Id.*

Appellant forced A.F. to adhere to certain "rules and tasks" — like call him "sir" and she "would get yelled at for saying something else." N.T., 5/3/21, at 143-44, 150. He also demanded that she "create a Backpage," which was "some type of prostitution website." *Id.* at 142. A.F. stated that the purpose was "to try and get . . . more men and women to come." *Id.* at 144. A.F. testified that she could not figure out how to create an account and Appellant became "very angry" with her. *Id.* A.F. indicated that she tried to comply with his request because Appellant had hit and threatened her before. *Id.* at 145. A.F. believed she stayed with Appellant for approximately eight days, but she was allowed to go back and forth to her mother's house. *Id.* She stated she continued to return to Appellant's hotel room because she "feared that [Appellant] would come after" her so she "just wanted to play the game,

---

[9] A.F. believed it was three men because she was blindfolded, she did not know an exact number. *See* N.T., 5/3/21, at 151.

keep him happy so nobody [she] knew would get hurt." *Id.* at 145-46. A.F. eventually went to the police and Appellant was convicted of human trafficking, involuntary servitude, and terroristic threats. *Id.* at 147.

J.M. also testified at Appellant's trial. J.M. stated that she met Appellant in person on October 27, 2019, at a Bethlehem hotel, after communicating with him on a dating application and then over the phone.[10] *See* N.T., 5/3/21, at 158. They drank alcohol and smoked weed, and Appellant tricked J.M. into "smoking crystal meth" by telling her that she was "smoking THC oil wax." *Id.* at 162. Appellant then proceeded to sexually assault J.M for approximately 15 hours. *Id.* at 163-64. He gave her "instructions[,]" which included watching animal pornography while being raped by him and at the same time, texting "men on Seeking Arrangements[11] to set up dates with them for money that [she] was going to then bring back to him." *Id.* at 164. She said she was beaten for not doing exactly what he requested. *Id.* Additionally, like A.F. and the Victim, Appellant told J.M. that "sir was his name." *Id.* at 165.

J.M. testified that Appellant's plan "was to have [her] meet these men" on the Seeking Arrangements website and "sleep with them, get money,

---

[10] J.M. was 26 years old at the time. *See* N.T., 5/3/21, at 157.

[11] J.M. described "Seeking Arrangements" as a dating website where "older men pay for [younger] women to go on dates with them." *See* N.T., 5/3/21, at 165. She stated "it is commonly used for prostitution." *Id.*

collect it, and give it to him. And then when [she] came back to the room, he was going to also have men lined up waiting for [her] to just . . . one at a time or all together, do whatever they wanted to do with [her]." *See* N.T., 5/3/21, at 166. Appellant placed a "GPS tracker" on J.M.'s phone and a "Cash App . . . to exchange money." *Id.* at 167. She also testified that Appellant had punched her in the face, strangled her, and burned her back with a butane lighter. *Id.* at 169. J.M. said she agreed to comply with his request because she "had to play his game" in order to escape. *Id.* at 168. Therefore, she arranged for a date with a man named "Anthony" who would pay $300.00 to have sex with her. *Id.* at 166-67. J.M. used meeting "Anthony" as a ploy — she escaped the room and called her father, who contacted the police. *Id.* at 170. Appellant was charged with multiple offenses relating to the incident, and convicted of rape, strangulation, attempted human trafficking, terroristic threats, and simple assault. *Id.* at 171.

Appellant also took the stand and testified at his trial. He stated that the Victim initiated the sexually explicit communications when she asked him about his "fantasies" and he "gravitated [his] conversation towards that as well." N.T., 5/4/21, at 10. He stated he never "forced" her to engage in these types of conversations, and did not yell at her. *Id.* at 10-11. Appellant recited text messages that were sent by the Victim, indicating that she "care[d] about" him, his well-being, and his happiness. *Id.* at 16. He stated that the "dominant/submissive relationship" was "all fantasy." *Id.* at 17. He refuted

telling the Victim that "she would be having sex with men for money" on rabbitscam.com. *Id.* at 20. Moreover, he testified that the idea of her having sex with 20 to 30 men was a "fantasy" he suggested after she asked for him to describe a "wild fantasy." *Id.* He stated the idea of going to a sex club or having sex in a condo were also fantasies. *Id.* at 21. Appellant also denied that there was any reference made by him that the Victim would have sex for money, including when he texted her that he was going to have her "fuck for [him]." *Id.* at 22. He compared it to a situation where someone "tell[s a] friend, go have a drink for me." *Id.* at 23.

On cross-examination, Appellant denied "trying to make [himself] look good" at the beginning of his relationship with the Victim.[12] *See* N.T., 5/4/21, at 24. He also denied that the assaults against A.F. and J.M. ever happened. *Id.* at 30, 32-33. He rebuffed the Victim's testimony that he required her to call him "sir," stating he "thought it was a fantasy that she would like." *Id.* at 37. Lastly, he did not recall why he wanted her to contact the police, but that he did not want her to talk to them because the Victim "said that [the District Attorney's Office was] . . . forcing her to talk to them, which [he] didn't think was right because [they] didn't do anything wrong." *Id.* at 45, 47.

_____

[12] Appellant told the Victim he was a "regional vice president for LA Fitness" in the Pittsburgh region, but police officers discovered that his job position was listed as a "[t]rainer" on tax filings. *See* N.T., 5/4/21, at 25, 68.

- 11 -

On May 4, 2021, the trial court found Appellant guilty of solicitation to commit promoting prostitution. On May 13, 2021, the court sentenced Appellant to a term of 19 months to seven years' incarceration, to be served consecutive to sentences for which he was already serving. Appellant filed post-sentence motions on May 24, 2021, raising, *inter alia*, claims that there was insufficient evidence to support his conviction, the verdict was against the weight of the evidence, and trial court erred in admitting the Rule 404(b) evidence. The Commonwealth filed a brief in opposition to Appellant's post-sentence motion on October 1, 2021. The court then denied Appellant's motion on October 20, 2021, and included a statement of reasons. This timely followed.[13]

> Appellant presents four issues for our review:
>
> A. Was the evidence presented at trial insufficient to convict Appellant of promoting prostitution?
>
> B. Was the evidence presented at trial insufficient to convict Appellant of solicitation to promote prostitution because the evidence was at variance with the charge in the [c]riminal [i]nformation?
>
> C. Was Appellant's conviction against the weight of the evidence and did the [t]rial [c]ourt abuse its discretion in finding to the contrary?

---

[13] On November 2, 2021, Appellant complied with the trial court's directive to file a Pa.R.A.P. 1925(b) concise statement of matters complained of on appeal. On December 2, 2021, the trial court filed a Pa.R.A.P. 1925(a) statement, indicating that it was going to rely on its October 20, 2021, statement of reasons.

D. Did the [t]rial [c]ourt abuse its discretion in allowing A.F. and J.M. to testify as [Pa.R.E.] 404(b) witnesses?

Appellant's Brief at 6.

In Appellant's first argument, he alleges there was insufficient evidence to convict him of promoting prostitution or soliciting the promotion of prostitution. *See* Appellant's Brief at 16. He states that none of three instances of "promotions" for which he was accused of — cosplay, rabbitscam.com, and having sex with 20 to 30 men — "were promotions of prostitutions." *Id.* at 19. He alleges that he never "instructed or advised [the Victim] to have sex for money." *Id.* He complains that "despite alleging in the [c]riminal [i]nformation that [Appellant] pressured [the Victim] to enter into a sex slave contract," the Commonwealth never presented any evidence to support that contention, and in contrast, "even [the Victim] agreed that [Appellant] did not promote her prostitution over the phone or in letters." *Id.* at 19-20.

Relying on *Commonwealth v. Bleigh*, 586 A.2d 450 (Pa. Super. 1991), Appellant maintains that what he "was describing as cosplay comes nowhere near the meaning of prostitution" because "it did not involve actual sexual activity." Appellant's Brief at 20. Moreover, as for the "rabbitscam.com" conduct, Appellant states there was no evidence he "stated or intended for [the Victim] to have sex on the webcam, nor is there any evidence that [the Victim] understood [his] statements or intentions to be that she would have sex on the webcam." *Id.* Furthermore, he asserts "[t]he

- 13 -

group sex parties were not prostitution since there was no discussion that money or anything of value would be exchanged in connection with such activities." *Id.* Appellant alleges his comments about the sex parties were "pure fantasy," explaining:

> The takeaway from that message was clearly that [Appellant] imagined [the Victim] having sex with 20-30 men throughout the night while he was present . . . and that the group sex would take place at a sex club or "the condo we have." [Appellant] promised that "the guys" having sex with [the Victim] would listen to him. Indeed, a fair review of the tablet messages demonstrates that [he] was referring to [the Victim] having sex with 20-30 men *at condo sex parties*.

*Id.* at 20-21 (italics in original; citations omitted).

Additionally, Appellant contends the Commonwealth failed to demonstrate that he "encouraged [the Victim] to make money off of her having sex with those 20-30 men." Appellant's Brief at 21-22 (footnote omitted). He points to the Victim's testimony expressing excitement regarding the idea of doing these acts for profit, while he "merely" messaged the Victim and said, "'We are going to make a ton of money, trust me.'" *Id.* at 22 (citation omitted). He also states that "no reasonable person could take [these fantasy suggestions] seriously, especially given the constraints on [his] ability to attend such parties." *Id.* at 24-25. Likewise, with regard to when he asked the Victim to set up a "rabbistcam.com" account, he states: "[T]he logical inference is that [Appellant] was addressing making money from rabbitscam.com webcamming, and not [the Victim] having sex with other men." *Id.* at 22-23. Appellant further defends his actions, stating that if he

were encouraging [the Victim] to prostitute herself, *i.e.*, engage in sexual relations for money, surely he would have been more explicit in explaining to [the Victim] *how* having sex with other men would generate income for the two of them. He did not tell [her] what to charge, when and how to collect payment, or how he planned to aid her in this venture while serving an effective life sentence.

*Id.* at 24 (italics in original).

We begin with our well-settled standard of review:

The standard we apply when reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence.

Furthermore, in evaluating the sufficiency of the evidence, we do not review a diminished record. Rather, the law is clear that we are required to consider all evidence that was actually received, without consideration as to the admissibility of that evidence or whether the trial court's evidentiary rulings are correct.

*Commonwealth v. Gray*, 867 A.2d 560, 567 (Pa. Super. 2005) (citations & quotations marks omitted).

"A person is guilty of solicitation to commit a crime if with the intent of promoting or facilitating its commission he commands, encourages or requests another person to engage in specific conduct which would constitute such crime or an attempt to commit such crime or which would establish his complicity in its commission or attempted commission." 18 Pa.C.S. § 902(a). A person is guilty of prostitution, in relevant part, if they are "an inmate of a house of prostitution or otherwise engages in sexual activity as a business[.]"[14] 18 Pa.C.S. § 5902(a)(1). A person is guilty of promoting prostitution, in pertinent part, when they "encourage[e], induc[e], or otherwise intentionally caus[e] another to become or remain a prostitute[.]" 18 Pa.C.S. § 5902(b)(3).

Here, the trial court found the evidence produced at trial sufficiently supported Appellant's conviction. **See** Trial Ct. Op., 10/20/21, at 6. The court pointed to the "tasks" Appellant commanded the Victim to follow, which included having sex with 20 to 30 men in exchange for money, and that he told her that she would "'fuck for him to make money.'" **Id.** at 6-7 (record citation omitted). The court also noted the "testimony of A.F. and J.M. further demonstrated [Appellant]'s plan, lack of mistake, and common scheme of

---

[14] In other words, "in order for there to be prostitution, there must not only be sexual activity (i.e., manual sexual stimulation), but a payment of money as well, in other words, a prostitution business. . . . Business is a commercial activity engaged in for gain." **Commonwealth v. Johnson,** 670 A.2d 666, 669 (Pa. Super. 1996) (citation & quotation marks omitted).

exploiting women for money through sexual acts." ***Id.*** at 7. The court concluded:

> In the communications between [the Victim] and [Appellant], [Appellant] blatantly promotes prostitution. [He] encouraged and induced [the Victim] to engage in sexual activity as a business. Certainly, the underlying act of having sex with 20 to 30 men for money constitutes prostitution as defined in 18 Pa.C.S.[ ] § 5902(a). The testimony of A.F. and J.M. further supports [Appellant]'s conviction beyond a reasonable doubt. Therefore, the Commonwealth produced sufficient evidence to convict [Appellant] of promoting prostitution under 18 Pa.C.S.[ ] § 5902(b).

***Id.*** at 7-8.

We agree with the trial court's well-reasoned opinion. Contrary to Appellant's argument, a review of the record reveals he formed a relationship with the Victim *via* text messaging for the purpose of seeking to have her engage in sexual acts with men for a financial benefit. He began by asking the Victim to participate in a dominant/submissive relationship where he provided "rules" and "tasks" for her, and if she did not follow them, there would be "consequences." ***See*** N.T., 5/3/21, at 69-71, 82-84. He then suggested the Victim engage in "cosplay," which he described as dressing up "in sexy costumes" and playing video games on camera for "money." ***See*** N.T., 5/3/21, at 71-72; ***see also*** Commonwealth's Exhibit 3 at 14-15.[15] He

---

[15] The Commonwealth introduced into evidence a 46-page copy of all text messages between Appellant and the Victim from November 21, 2018 to January 3, 2019. ***See*** N.T., 5/3/21, at 79.

also tried to convince the Victim to sign up for the website, "rabbitscam.com," for the purpose of making "money [by] doing sexual things[,]" and proposed that she participate in a sexual activity where she would have intercourse with 20 to 30 men in one night. *See* N.T., 5/3/21, at 73-74. Specifically, on January 2, 2019, at 7:12 a.m., he texted the Victim:

> Well what turns me on is when I see my sub doing whatever it is I tell her to do. . . . **I want you to set up an account on rabbitscam.com. That needs to be done today. No debate on that one.**
>
> **The amount [of men] depends but to start its going to be anywhere from 20 [to] 30 [men]. It will be an all night thing**. . . . The guys will listen to me or they'll get fucked up. Bottom line and very simple. If they deviate from anything it will be the same result.

*See* Commonwealth's Exhibit 3 at 43 (paragraph break & emphases added). At 8:23 a.m. that same morning, he texted: "The rabbitcam start up is free. You asked how many guys and I told you. . . . I also see you not doing what I told you to do. That's unacceptable. Do you understand me?" *Id.* Approximately seven minutes later, he sent two text messages:

> We need to get this going [as soon as possible]. Especially **[i]f you are having financial issues and if I can't get to any of mine** right now. **I need you to be strong for me and get this going. We are going to make a ton of money**, trust me.
>
> Tell me you're ready to take that many at once or one after another for your man. Tell me you'll take as many as I tell you to. Tell me how you want it done and tell me if you prefer them at once or one after another. Now.

*Id.* (emphases added). In additional texts sent later that morning, Appellant again told the Victim "to get that rabbitcams [sic] started today" and that "**[i]f**

- 18 -

**money mean[t] a lot to [her**,]" then she should "listen" to him and he would "**show**" her "**how [she] can make it**." *Id.* at 43-44 (emphasis added). The following day, Appellant sent another message, stating: "That's why I'm trying to tell you it[']s going to be rough here now. **Especially when I have you start doing your tasks. When I start having you fuck for me**." *Id.* at 46 (emphasis added). Based on the totality of the circumstances, it is evident from Appellant's own words that not only did he encourage, but he demanded that the Victim engage in sexual activity for the purpose of making money *via* the "rabbitscam.com" website and having sex with "20 to 30 men" over the course of one night.[16]

To the extent Appellant argues the Victim testified that Appellant did not promote prostitution over the phone or in letters, he misconstrues the evidence — the Victim did testify that their sexually explicit communications took place **solely** over the tablet. *See* N.T., 5/3/21, at 89. Therefore, this argument is meritless. Moreover, regarding his assertion that there was no evidence he intended for the victim to have sex *via* web camera, we discern that while Appellant did not set forth specifics regarding what the Victim was supposed do on the "rabbitscam.com" website, the record is clear that he wanted her to set up the account for the purpose of making money while

---

[16] We also agree with the trial court that A.F.'s and J.M.'s testimony further supports the conviction because their statements demonstrate Appellant's common scheme of exploiting women for money through sexual acts.

- 19 -

committing sexual acts, and he repeatedly asked her to do so. *Id.* at 73; *see also* Commonwealth's Exhibit 3 at 43-44. The Victim also testified that while there was no financial plan as to the distribution of income from the "20 to 30 men" night, it "was all up to" Appellant because he gave her a command and she listened. *Id.* at 100. As such, that assertion is of no avail.

Additionally, while Appellant tries to argue that the Victim expressed excitement over having sex with 20 to 30 men, she testified that she played along because she was afraid Appellant would retaliate against her and she "did not know what type of person or people he ha[d] outside of the prison." *See id.* at 76, 78. Moreover, we note that while the Victim recognized that some of Appellant's requests could be considered fantasies, she testified she knew he was "serious" about the 20 to 30 men situation "because he kept demanding it." *Id.* at 74. We reiterate that the trial court, sitting as the fact-finder, was "free to believe all, part or none of the evidence[,]" and here, it chose to believe the Victim's testimony. *See Gray*, 867 A.2d at 567.

Lastly, we find Appellant's reliance on *Bleigh*, *supra*, is misplaced. In *Bleigh*, a panel of this Court held that "self-masturbation for hire without any physical contact between performer and viewer is not the type of conduct intended to come within the purview of [S]ection 5902." *Bleigh*, 586 A.2d at 453. Here, however, the trial court did not just rely on the fact that Appellant suggested the Victim engage in cosplay, which would purportedly involve masturbation, to find that he committed the crime of solicitation to commit

promoting prostitution — the court also relied on the above-mentioned sexual acts which involved sexual intercourse. Moreover, we also note that in a 1996 case, ***Johnson***, ***supra***, a panel of this Court opined that "masturbation of a male by a female for money constitute[s] sexual activity as a business" for prostitution purposes. ***Johnson***, 670 A.2d at 669. Therefore, we are not persuaded by Appellant's argument with respect to ***Bleigh***. Accordingly, we conclude that his first argument fails.

In Appellant's second argument, he alleges: "[E]ven if this Court believes that sufficient evidence existed to find that [he] promoted [the Victim] to engage in prostitution, there is absolutely no evidence to find [him] guilty of the offense with which he was actually charged in the [c]riminal [i]nformation." Appellant's Brief at 26. He states that "the evidence presented at trial did not support the charge set forth in the [c]riminal [i]nformation, which resulted in the evidence at trial being at variance with the charge in the [c]riminal [i]nformation. Thus, the [c]riminal [i]nformation as filed misled [Appellant] as to the charge against him." ***Id.*** at 27.

> With respect to variance, we are guided by the following:
>
> If there exists a variance between the allegations of an information and proof at trial, such variance is harmless error unless a defendant could be misled at trial, prejudicially surprised in efforts to prepare a defense, precluded from anticipating the prosecution's proof, or otherwise impaired with respect to a substantial right.

***Commonwealth v. Lohr***, 468 A.2d 1375, 1377 (Pa. 1983). "A variance is not fatal unless it could mislead the defendant at trial, impairs a substantial

J-S22019-22

right or involves an element of surprise that would prejudice the defendant's efforts to prepare his defense." ***Commonwealth v. Einhorn,*** 911 A.2d 960, 978 (Pa. Super. 2006). It also merits mention that "[i]ndictments must be read in a common sense manner and are not to be construed in an overly technical sense." ***Commonwealth v. Ohle***, 470 A.2d 61, 73 (1983) (citation omitted).

Turning to the certified record, the criminal information[17] charged Appellant with "Criminal Solicitation to Promote Prostitution-Encourage Prostitution." Criminal Information, 5/3/21. The information identified the statutory subsections are 18 Pa.C.S. §§ 902(a) and 5902(b)(3). ***See id.*** The grading of the offenses was correctly identified as a third-degree felony. ***See id.*** The factual predicate supporting the charge was as follows:

> Defendant while an inmate at the Northampton County Correction, did engage in sexual explicit communication via phone, digital message, and in writing with a 27 year old female for the purpose of soliciting her to perform sex acts for money. The Defendant comm[un]icated with the victim on numerous occasions and his instructions for her to enter into a sex slave contract with him at his direction she would engage in various sex acts for money, which they would both profit from.

***Id.***

---

[17] We note the original information was docketed on July 17, 2019; however, a copy was not included in the record. Nevertheless, an amended information was included in the record and indicated that the only change from the original copy was a spelling error regarding the word, "communicated." ***See*** Amended Information, 5/3/21. Therefore, we will refer to this version.

- 22 -

Thus, applying a common-sense approach, we find that Appellant's argument flies in the face of the record. At trial, the Victim testified to facts that were substantially similar to those set forth in the information — that she communicated with Appellant via telephone, letters, and text messaging. *See* N.T., 5/3/21/ at 89. He provided her with a set of ten rules which she was required to follow. *See id.* at 69. As stated above, she testified that he commanded her to engage in several sexual enterprises for monetary purposes. *See id.* at 72-74; 76-77, 87-88, 100. Accordingly, we do not discern that Appellant was "misled at trial," or was "prejudicially surprised" in such a way that he could not prepare a defense that anticipated the Commonwealth's proof. *See Lohr*, 468 A.2d at 1377. Therefore, Appellant's second sufficiency argument is unavailing.

In Appellant's third claim, he claims that the conviction was against the weight of the evidence.[18] *See* Appellant's Brief at 27. Appellant "incorporates" his sufficiency discussion, and states that the evidence "demonstrated that [the Victim] could not have reasonably believed that [he] intended for her to engage in any acts that would constitute prostitution." *Id.* at 28. Moreover, he maintains that "any purported acts of prostitution in which [he] would participate with [the Victim] were mere fantasies since [he]

---

[18] Appellant properly preserved his weight claim by raising it in his post-sentence motion. *See* Pa.R.Crim.P. 607(A)(3); *see also Commonwealth v. Thompson*, 93 A.3d 478, 491 (Pa. Super. 2014) (failure to preserve weight claim pursuant to Rule 607 results in waiver).

- 23 -

was serving an effective life sentence for multiple rapes and other serious crimes." *Id.* Likewise, he suggests the Victim portrayed herself as "some helpless, vulnerable, damsel in distress" at trial while her text messages to Appellant "reflect a free-flowing conversation over many months between [the two] that alternated between the mundane, the raunchy, and the frankly depraved, but always with [the Victim] as a willing and eager participant." *Id.* at 29. He notes that she "resisted his entreaties" to engage in cosplay, sign up for "rabbitscam.com," and have sexual relations with 20 to 30 men. *Id.*

Appellant also relies on his testimony to support his weight claim, pointing out that he testified: (1) the "brief discussion" about the Victim having sex with 20 to 30 men was just "a 'wild fantasy;'" (2) he never intended the Victim to have sex with other men while engaging cosplay or while on "rabbitscam.com"; and (3) he "was offering up fantasies to [the Victim] upon her request[.]" Appellant's Brief at 29-30. Appellant concludes that if he "were truly promoting the prostitution of [the Victim], he would have done so over the telephone where he could have explained his plans in detail, as opposed to doing so ambiguously through the constraints of the tablet text messages." *Id.* at 30.

We note the relevant standard of review for challenges to the weight of the evidence:

> The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none or some of the evidence and to determine the credibility of the witnesses. Resolving contradictory testimony and questions of credibility are matters for the finder of

fact.  It is well-settled that we cannot substitute our judgment for that of the trier of fact.

Moreover, [a]ppellate review of a weight claim is a review of the exercise of discretion, not the underlying question of whether the verdict is against the weight of the evidence.  Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is [or is not] against the weight of the evidence.  One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

Furthermore, in order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court.

*Commonwealth v. Miller*, 172 A.3d 632, 642-43 (Pa. Super. 2017)

(citations & quotation marks omitted).

Further, this Court will not find an abuse of discretion

based on a mere error of judgment, but rather . . . when the [trial] court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.  Importantly, [this C]ourt should not find that a trial court abused its discretion merely because [we] disagree[ ] with the trial court's conclusion.  Indeed, when reviewing the trial court's exercise of discretion, it is improper for [this C]ourt to step[ ] into the shoes of the trial judge and review the evidence *de novo*.  In other words, [this C]ourt may not disturb a trial court's discretionary ruling by substituting its own judgment for that of the trial court.

*Commonwealth v. Gill*, 206 A.3d 459, 467 (Pa. 2019) (citations & quotation

marks omitted).

Here, the trial court found the following:

[Appellant] illustrates the discussions of [the Victim] having sex with 20 to 30 men as mere fantasy. Contrary to this contention, as mentioned above, [Appellant] outright demanded that [the Victim] have sex with these men for money. Combined with the testimony of A.F. and J.M[.], the weight of the evidence supports [Appellant]'s conviction.

Trial Ct. Op. at 9 (record citations omitted).

We again agree with the trial court's determination. Appellant's argument essentially amounts to a request for this Court to reassess the credibility of the Commonwealth's witnesses, particularly the Victim, and Appellant's own testimony. Moreover, he seeks for us to reweigh the testimony and evidence presented at trial in his favor and find that these communications just amounted to fantasy talk between himself and the Victim. We are not permitted to entertain this request. *See Miller*, 172 A.3d at 642-43. Our review of the record shows that the evidence was not tenuous or vague, the trial court did not reach a conclusion that overrode or misapplied the law, the judgment was not manifestly unreasonable and the result of partiality, prejudice, bias or ill-will, and the verdict was not so contrary as to shock the trial court's conscience. *See id.*; *see also Gill*, 206 A.3d at 467. Accordingly, we discern no abuse of discretion regarding the trial court's denial of Appellant's weight claim. Therefore, his third claim fails.

Lastly, Appellant contends the trial court abused its discretion by admitting the testimonies of A.F. and J.M. as Pa.R.E. 404(b) witnesses. *See* Appellant's Brief at 31. Specifically, he alleges that "[m]ost of the claimed commonalities between" the three cases "are without any basis in the trial

record." *Id.* at 33. In support of his argument, Appellant points to the fact that there was no evidence that A.F. and J.M. struggled financially, and none of the victims testified that he forced them into a sex slave contract. *Id.* at 33. Furthermore, he states:

> The [t]rial [c]ourt also claims that [he] "required all three victims to accomplish 'tasks' that were sexual in nature, and he threatened the victims with consequences if they failed to complete the 'tasks.'" Again, one is at a loss to understand what the [t]rial [c]ourt is referring to here. While there is a reference in the tablet exchanges to [the Victim] performing "tasks[,"] [Appellant] did not "threaten" her with consequences if she failed to perform them. With regard to J.M. and A.F., the [t]rial [c]ourt does not even attempt to explain what "tasks" it refers to, or what the threats were if those two women failed to complete them.

*Id.* at 33-34. Appellant also argues "neither of the A.F. or J.M. fact patterns involved grooming[,]" which was alleged in the present case. *Id.* at 34. He states, "The dissimilarities between the cases are readily apparent when one considers that [he] was not charged with promoting the prostitution of J.M. or A.F. and was not charged in [the Victim]'s case with any of the offenses charged in the prior trial." *Id.*

He claims the "prior bad acts" evidence failed to demonstrate absence of mistake because he "did not assert he was mistaken about what he was doing in the tablet messages with [the Victim]. He knew what he was doing; however, what he was doing was *not* promoting prostitution." Appellant's Brief at 34-35 (italics in original). As for motive, Appellant alleges the following:

- 27 -

The Commonwealth argued that [he] encouraged [the Victim] to prostitute herself so that he could share in the earnings. If that is true, then the Commonwealth already had evidence of motive, i.e., to make money, from the self-contained facts of this case and did not need as witnesses the victims from another case involving entirely different charges and fact patterns. Even assuming that [Appellant] had the same motive in prior crimes *does not mean the prior crimes motivated him to commit this crime*. The Commonwealth and the [t]rial [c]ourt confused motive with common plan/scheme, which is equally inapplicable here.

*Id.* (italics in original). Lastly, he asserts the "prior bad acts" evidence at issue does not go to common plan or scheme because "the cases of J.M. and A.F. involved allegations of [him] being in a hotel room with the alleged victims and forcing them into having sex with him and, in some cases, other men[,]" whereas here, he was imprisoned and communicating remotely with the Victim and therefore, he could not have raped her or forced her to have sex with other men. *Id.* at 35. He maintains, "In contrast to the simple but concrete plans involving J.M. and A.F. having sex with other men for money, the sexual discussions with [the Victim] were in the realm of pure fantasy." *Id.* at 36.

We note the applicable standard of review for admissibility of evidence challenges:

Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and a reviewing court will not reverse the court's decision on such a question absent a clear abuse of discretion. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

*Commonwealth v. Crosley*, 180 A.3d 761, 768 (Pa. Super. 2018) (citations & quotation marks omitted).

Generally speaking, "[a]ll relevant evidence is admissible[.]" Pa.R.E. 402. Evidence is deemed relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401(a)-(b). Regardless of relevancy, however, the Pennsylvania Rules of Evidence generally preclude the type of evidence alleged to be at issue herein — evidence of a defendant's prior crimes or bad acts. *See* Pa.R.E. 404(b)(1).

Pa.R.E. 404(b)(1) prohibits evidence of a defendant's prior crimes or bad acts simply to prove their bad character. *See* Pa.R.E. 404(b)(1). However, such evidence may be admissible when offered for another purpose, such as to prove motive, intent, identity, or absence of mistake, or pursuant to the *res gestae* exception, that is, where it is "part of the history of the case and form[s] part of the natural development of facts." Pa.R.E. 404(b)(2); *Commonwealth v. Ivy*, 146 A.3d 241, 251 (Pa. Super. 2016). "In a criminal case, this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2).

Here, the trial court explained its rationale for admitting the testimony of A.F. and J.M. as Rule 404(b) evidence:

> [Appellant]'s prior bad acts against A.F. and J.M. show [his] motive, opportunity, intent, preparation, and plan to prostitute [the Victim]. All three victims share similar characteristics. The victims are all white females close in age to [Appellant], and all of

- 29 -

the victims struggle financially. [Appellant] initially met the three victims through seemingly legitimate interactions, and he then groomed each victim over time. Eventually [he] forced each victim into a sex slave contract and promoted prostitution. [Appellant] required that each victim call him "sir" and established a dominant/submissive relationship with each victim. [Appellant] required all three victims to accomplish "tasks" that were sexual in nature, and he threatened the victims with consequences if they failed to complete the "tasks." Additionally, there is a lack of remoteness between the incidents. In fact, the incidents involving [the Victim] occurred throughout the duration of [Appellant]'s trial for the crimes committed against A.F. and J.M. and continued after [Appellant]'s conviction.

Given the stark similarities between the conduct relating to all three of the victims and the lack of remoteness in time, evidence of [Appellant]'s prior bad acts against A.F. and J.M. is probative in this case and is not outweighed by its potential for unfair prejudice against [Appellant].

Trial Ct. Op. at 10-11 (record citation omitted).

We agree with the court's rationale and conclude that the circumstances concerning Appellant's prior bad acts committed against A.F. and J.M. are substantially similar to the present matter such that the trial court did not abuse its discretion in admitting their testimony. Appellant attempts to quibble over semantics in distinguishing the case *sub judice* from the prior two cases. Nevertheless, he is incorrect with his assertions. For example, Appellant argues that neither witness testified they struggled financially but A.F. stated that she told a friend she wanted to make money and that friend introduced her to Appellant. *See* N.T., 5/3/21, at 141. He also misconstrues the court's rationale by stating the court found Appellant forced all three women into sex slave contracts when it did not detail what "tasks" it referred

to with regard to the demands Appellant made on all three women, or specify the threats he made against those women if they failed to obey. However, the court did mention that Appellant required all three women to call him "sir," he demanded that they sign up for certain websites in order to prostitute themselves, and he threatened each of them if they failed to adhere to his rules by physical means or *via* text messaging. The disputed evidence showed Appellant had a pattern or common scheme where he demanded these women to adhere to his rules by completing different tasks. **See** Pa.R.E. 404(b)(2). Notably, Appellant fails to present any authority to persuade us otherwise.

Appellant also attempts to emphasize the fact that he was incarcerated when he committed the crimes at issue and therefore, this case is dissimilar to the other two. We find this argument unavailing. The focus is not on the location of Appellant at the time he committed the crimes but the fact that in all three cases, he either forced the woman to engage in sexual activities for money (A.F.) or attempted to solicit the woman to engage in prostitution (J.M. and the Victim) by setting up accounts on websites.

This evidence also was relevant to show that Appellant was not merely engaging in fantasy conversations — this was not a mistake or miscommunication on the part of the Victim. Accordingly, we conclude the trial court did not abuse its discretion in admitting this Rule 404(b) prior bad acts evidence because it was offered motive, absence of mistake, and common

scheme. **See** Pa.R.E. 404(b)(2). Therefore, Appellant's final argument has no merit.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/27/2023